FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2006 FEB 23  AM 11: 45

CLERK
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

UNITED STATES OF AMERICA          )
                                  )
            v.                    )        CR 105-124
                                  )
CHRISTOPHER JAMES BROWN           )

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

In the above-captioned criminal case, the government has accused Defendant James Christopher James Brown ("Brown") of possession of a firearm and ammunition by a convicted felon.  The matter is now before the Court because Brown moved to suppress "all physical evidence seized during the Richmond County traffic stop that occurred on April 26, 2005." (Doc. no. 12).  The Court held an evidentiary hearing on the matter, at which time the Court heard testimony from Deputy Aunarey Herbert ("Deputy Herbert") with the Crime Suppression Unit of the Richmond County Sheriff's Office ("RCSO"), Deputy Marcial Rodriguez ("Deputy Rodriguez"), formerly with the Crime Suppression Unit of the RCSO,[1] and James Brown, father of Defendant Brown.[2]  Now, for the reasons developed more fully herein, the Court **REPORTS** and **RECOMMENDS** that the motion to suppress be **DENIED**.

---

[1]Deputy Rodriguez currently works in the Housing Division of the RCSO, but at the time of the events in question in this motion, he worked with the Crime Suppression Unit.

[2]The government invoked the Rule of Sequestration at the hearing.

## I. FACTS

At the time of the contested traffic stop on April 26, 2005, Brown was driving a 1991 Buick that his father had purchased on April 20, 2005 from a co-worker. Brown's cousin was a passenger in the car, and Brown and his cousin had just dropped Brown's father at work at the Augusta-Richmond County Civic Center. Brown had been given express permission by his father to drive the vehicle.

Deputy Herbert, a seven and one half year veteran of the RCSO, initiated a traffic stop because the Buick did not display a state license plate, but instead had a piece of cardboard taped to the inside of the rear windshield that bore the handwritten words "TAGS APPLIED FOR."[3] Deputy Herbert wanted to verify the registration and investigate whether the car was stolen. The hearing testimony established that there was nothing blocking the cardboard sign from view, and Deputy Herbert saw the sign prior to initiating the stop.

Upon stopping the vehicle, Deputy Herbert approached the Buick, explained to Brown that he had been stopped because he did not have a license tag, and asked for Brown's driver's license and registration, as well as for identification from Brown's passenger. Deputy Herbert testified that it was during this first encounter with Brown that he smelled an odor of non-burning marijuana coming from the Buick. However, Deputy Herbert, alone in a high crime area of Augusta, opted not to mention the marijuana at that time for safety reasons. Instead, he went back to his vehicle to begin checking the license information he

---

[3]Brown's father testified at the hearing that, in fact, no application for tags had been made as of the time of the traffic stop on April 26, 2005.

2

had received and, because Brown could not immediately produce a bill of sale or other proof of ownership, checking the vehicle identification number of the Buick.

While Deputy Herbert went back to his vehicle, Brown called his father to ask for assistance with locating a bill of sale. Brown's father explained that he did not have a bill of sale and that he would come to the scene of the traffic stop. In the meantime, Deputy Rodriguez had arrived at the scene of the traffic stop. Deputy Rodriguez testified that he and Deputy Herbert would serve as each other's back up for safety reasons and that because they worked on patrol in a team in a high crime area, it was common for him to arrive within approximately five minutes of when Deputy Herbert made a stop. Upon his arrival, Deputy Herbert explained the basis for his stop and his suspicion of smelling marijuana; he asked Deputy Rodriguez for his assistance in corroborating his suspicion. Moreover, Deputy Herbert had discovered that there was an outstanding warrant for Brown's passenger.

Thus, Deputies Herbert and Rodriguez jointly removed Brown's passenger from the Buick and placed him in the back of a law enforcement vehicle. Deputy Rodriguez then approached the driver's side of the Buick to talk to Brown, who was still in the driver's seat of the Buick. Deputy Herbert remained a few steps back from the Buick while Deputy Rodriguez spoke to Brown, and it was Deputy Herbert who spoke with Brown's father upon his arrival at the scene.

Brown's father testified that when he arrived, one officer was holding some paperwork for the car and told him (the father) that the title had been located and everything was fine; Brown would be free to go once the passenger with the outstanding warrant had been processed. Brown's father observed that the second deputy was already at the driver's

3

side window talking to Brown, and Brown's passenger was secured in the back of a law enforcement vehicle. Deputy Herbert did not recall telling Brown's father that Brown would be free to go because the issue of the ownership of the vehicle had been resolved. Moreover, he testified that he specifically did not tell Brown's father about the on-going marijuana investigation because he was trying to keep the scene calm; it was his experience that when a family member gets upset, the tension on the scene can quickly escalate[4] and/or a situation develops in which a crowd outnumbering the officers gathers as more individuals are called to the scene.

While Deputy Herbert was speaking with Brown's father, Deputy Rodriguez continued his conversation with Brown at the car window. Deputy Rodriguez testified that when he came up the car, he, too, smelled the non-burning marijuana. When he asked Brown if there was marijuana in the car, Brown became nervous - exhibiting rapid breathing, sweating, and shaking hands- and began leaning towards the driver's side door. Deputy Rodriguez asked Brown to step out of the car, and the deputy saw a plastic bag of marijuana, containing just over six grams of the drug divided into several smaller plastic baggies, between the driver's seat and door. Deputy Rodriguez asked Brown if there was anything else in the car, and Brown told the deputy to look under the seat. There, Deputy Rodriguez found a loaded firearm. Brown was arrested.

From the time Deputy Herbert initiated the stop until the contraband was discovered, approximately twenty minutes had elapsed. The testimony at the evidentiary hearing put the

---

[4]Indeed, Deputy Rodriguez testified that when the marijuana was discovered, Brown's father began yelling and became so upset that he almost passed out.

time that Deputy Herbert initiated the traffic stop at 10:47 a.m., approximately one minute after the time at which Brown's father testified that he clocked in to work. Brown's father testified that Brown called him about fifteen minutes later, and it took him about three to four minutes to arrive at the scene of the traffic stop. Although both Deputies Herbert and Rodriguez testified that Deputy Rodriguez arrived approximately five minutes after the initial stop, defense counsel suggested that a dispatch log (prepared by an unknown individual who did not testify) showed that Deputy Rodriguez did not arrive at the scene until 11:07 a.m. However, Deputy Rodriguez explained that a dispatch log records when he "keys up" on his radio, and he did not "key up" until the drugs were found. Thus, his testimony was that he arrived on the scene well in advance of the point at which the dispatch log placed him at the scene.

This testimony about Deputy Rodriguez "keying up" when the drugs were found coincides with the time line suggested by the testimony of Brown's father that when he arrived on the scene, Brown's passenger had been secured in the back of a law enforcement vehicle, and one deputy was already at the driver's side window talking to Brown while the other deputy spoke to the father. As Brown's father testified that he was at the scene within approximately twenty minutes of the initial stop (called by his son fifteen minutes after arrival at work and another three to four minutes to reach the scene), and as Deputy Rodriguez had assisted in removing Brown's passenger and had already begun speaking with

Brown by the time the father arrived, the Court concludes that Deputy Rodriguez must have arrived at the scene prior to the 11:07 a.m. time listed on the dispatch log.[5]

## II. DISCUSSION

### A.    Validity of Initial Stop

Brown first challenges the initial stop of the Buick.[6] According to Brown, there was no valid basis for the original stop of the Buick because under Georgia law, a driver has thirty (30) days from the date of purchase of a car to obtain a valid license plate and registration. The applicable Georgia statute provides:

> It shall be a misdemeanor to operate any vehicle required to be registered in the State of Georgia without a valid numbered license plate properly validated, unless such operation is otherwise permitted under this chapter; and provided, further, that the purchaser of a new vehicle or a used vehicle may operate such vehicle on the public highways and streets of this state without a current valid license plate during the period within which the purchaser is required by Code Section 40-2-20 to register such vehicle . . . .

O.C.G.A. § 40-2-8(b)(2)(A). Reading the registration provisions of O.C.G.A. § 40-2-20 in tandem with the provisions of O.C.G.A. § 40-2-8 leads to the result that the purchaser of a new or used car has 30 days from the date of purchase to validly register the car and display a valid state license plate. If the car is purchased from a dealer, the driver is to be provided

---

[5]In any event, as discussed in more detail, *infra*, the timing of the arrival is not critical because only approximately twenty minutes lapsed before the contraband was discovered and Brown was subject to custodial arrest.

[6]As the car had not yet been registered at the time of the traffic stop, the record does not conclusively establish who technically owned the car. However, there is no dispute that Brown was driving the car with the permission of the person who had purchased the car, Brown's father. The Eleventh Circuit has ruled that the driver of a borrowed car has a legitimate expectation of privacy in the vehicle when the owner is absent such that the borrower-in-possession can challenge a search of the car. United States v. Miller, 821 F.2d 546, 548 (11th Cir. 1987).

with a temporary plate "made of heavy stock paper, inscribed with indelible ink" and shall display the "expiration date, the vehicle identification number, and the year, make and model of the vehicle."[7]  O.C.G.A. § 40-2-8(b)(2)(B)(i).  Notably, there is no statutory provision addressing the type of tag that must be displayed when, as in the current case, the purchase of a vehicle is not made through a car dealer.  Finally, the statutes specifically provide that a driver charged with not having a properly registered car is not subject to penalties during the 30-day registration period if the owner of the car provides evidence that he or she has properly applied for, but has not yet received, the registration for the vehicle.  Id. § (b)(4).

Under Terry v. Ohio, 392 U.S. 1 (1968), the police may briefly stop and detain persons in order to investigate a reasonable suspicion that those persons are involved in criminal activity, even in the absence of probable cause to believe that a crime has been committed.  United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990).  The Terry standard has been applied with equal force to traffic stops.  Id.  Reasonable suspicion is determined from the totality of the circumstances, United States v. Sokolow, 490 U.S. 1, 8 (1989), and requires that the officer point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the investigative stop. Terry, 392 U.S. at 21; see also United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999). Although the "reasonable suspicion" required for a Terry stop is less stringent than the requirement for probable cause, United States v. Mikell, 102 F.3d 470, 475 (11th Cir. 1996), "reasonable suspicion" does require that an officer have more than a "hunch" that criminal conduct is afoot based on unparticularized facts.  The officer must be able to articulate some

_____

[7] These dealer-issued, temporary plates are commonly referred to as "drive-out tags."

minimal, objective justification for the investigatory detention. United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989).

Here, the Court concludes that Deputy Herbert was justified in initiating a Terry stop on April 26, 2005, based on the fact that Brown was driving a vehicle that bore only a cardboard sign taped to the back window indicating that the tags had been applied for. As noted above, the applicable statute talks only about dealer drive-out tags and state-issued license plates; there is no statutory recognition for handwritten, homemade cardboard signs that state (falsely in this case) that an application for the proper tag had been made. Deputy Herbert testified that in his experience, homemade "TAGS APPLIED FOR" signs are often used to avoid paying registration fees or are sometimes placed on stolen vehicles. Thus, a brief, investigatory stop was authorized to confirm or dispel the possibility of criminal activity. Brown's argument to the contrary is simply not supported by the case law.

Brown cites to a Georgia case in which the Court of Appeals ruled that "stopping a car with a drive-out tag solely to ascertain whether the driver was complying with [Georgia's] vehicle registration law is also not authorized." Bius v. State, 563 S.E.2d 527, 530 (Ga. App. 2002); see also Berry v. State, 547 S.E.2d 664, 668-69 (Ga. App. 2001) (stopping a car with dealer drive-out tag based on inclination that vehicle might be stolen not permitted). An officer's "mere hunch" that a driver and owner of a car with a drive-out tag might not be operating the car in compliance with the vehicle registration laws does not provide a particularized and objective basis for suspecting criminal activity. Bius, 563 S.E.2d at 530. Notably, however, the tag at issue in Bius, as well as in Berry, was a dealer-issued tag, not the type of homemade sign at issue in the case before the Court.

Moreover, Georgia courts have not categorically prohibited all traffic stops that are based on a desire to investigate compliance with vehicle registration laws. For example, in Chiasson v. State, 549 S.E.2d 503 (Ga. App. 2001), the court had no problem with an officer stopping a car to investigate whether a car with a faded or weathered drive-out tag was in compliance with vehicle registration laws. Id. at 504. In fact, in Bius, the Georgia Court of Appeals specifically re-affirmed that an officer's suspicion about the appearance of a drive-out tag could authorize an investigatory stop. Bius, 563 S.E.2d at 529 (citing Chiasson).

Here, the lack of identifying information on the cardboard tag affixed to the window of the Buick struck Deputy Herbert as needing further investigation to determine whether the Buick was in compliance with vehicle registration laws and/or might be stolen. Although it is true that Brown's father was well within the 30-day grace period for obtaining the proper license and registration for the Buick, there was no way to know that from simply observing a sign in the back window that said "TAGS APPLIED FOR." The homemade sign bore none of the information required by O.C.G.A. § 40-2-8(b)(2)(B)(i) to be on a dealer's drive-out tag - namely, an expiration date, the vehicle identification number, and the year, make and model of the vehicle. Thus, although neither Brown nor the government could point to a case exactly on point, the situation is more akin to those cases cited by the government wherein investigatory stops were allowed when a license plate was not visible or was otherwise absent from a vehicle. See doc. no. 19, pp. 4-5 (collecting cases).[8] Indeed, the

_____

[8]For example, in United States v. Faulkner, 488 F.2d 328, 329-30 (5th Cir. 1974), the former Fifth Circuit recognized an officer's right to conduct a stop where a car had a partially detached back license plate and the required front license plate was missing; the officers were authorized to ask for a driver's license and to make a reasonable investigation of the ownership of the car. In Freeman v. State, 390 S.E.2d 300, 300 (Ga. App. 1990), the Georgia

handwritten tag in this case was basically the equivalent of having no tag, because, as detailed above, there was no identifying information on the cardboard sign.

In sum, the only statutorily-recognized exception to the requirement for displaying a valid Georgia license plate is displaying a dealer's temporary drive-out tag that contains specific identifying information about the car and the deadline for obtaining a Georgia license plate. The homemade sign in this case had no such identifying information or indication of when the 30-day grace period for registration would have expired. Thus, Deputy Herbert was justified in conducting a Terry stop to investigate whether Brown was operating the Buick in conformance with Georgia's vehicle registration laws and/or whether the car had been stolen.

**B.     Expanding the Scope of the Traffic Stop**

Brown further argues that even if the initial stop was valid, its scope was impermissibly expanded to include matters that caused his detention to be unconstitutionally prolonged. It is well-settled that an officer may prolong a traffic stop only under special circumstances, one of which is "to investigate the driver's license and the vehicle registration, [which may be done] by requesting a computer check." United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (citation omitted). Moreover, "an officer may prolong a traffic stop if he has articulable suspicion of other illegal activity." Id. Having said that, the Supreme Court has specifically refused to set a *per se* time limit on reasonable suspicion

---

Court of Appeals determined that an officer was authorized to stop a car based on the articulable suspicion that a non-moving traffic offense was being committed where a vehicle's license plate was not plainly visible, and therefore, an officer could not tell without conducting a stop whether the vehicle was being operated in violation of Georgia's vehicle registration laws.

stops. United States v. Place, 462 U.S. 696, 709 n.10 (1983).  Instead, the Court requires an examination of whether law enforcement officials diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. United States v. Sharpe, 470 U.S. 675, 686 (1985).  Using this case by case approach, the courts have allowed Terry-stops to last as long as seventy-five minutes. See United States v. Gil, 204 F.3d 1347, 1350-51 (11th Cir. 2000); see also United States v. Cooper, 873 F.2d 269, 275 (11th Cir. 1989) (affirming a thirty-five minute reasonable suspicion detention); United States v. Hardy, 855 F.2d 753, 761 (11th Cir. 1988)(affirming Terry-stop lasting almost fifty minutes).

Here, the initial stop was based on determining whether the car was in compliance with Georgia's vehicle registration laws and whether it had been stolen.  However, according to Deputy Herbert's testimony, he smelled marijuana upon his first encounter with Brown - the point at which he initially asked for Brown's license and registration and for identification from Brown's passenger.  At that point, the smell of marijuana provided reasonable articulable suspicion to expand the scope of the stop to investigate whether Brown and/or his passenger were involved in illegal activity having to do with drugs, regardless of the status of the car registration.  Accord United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991) ("Where, as here, the initial stop was legal, the [officer] had the duty to investigate suspicious circumstances that then came to his attention." (internal citations and quotation marks omitted)).  Despite this new suspicion of criminal activity, Deputy Herbert testified that he did not immediately inform Brown that he smelled marijuana for safety reasons, namely, he was on a traffic stop in a high crime area by himself.  Therefore, Deputy Herbert

11

went back to his vehicle to run the license information, check the vehicle identification number for the Buick, and wait for back up to confirm or dispel his suspicions concerning the marijuana he thought he smelled.

The back up arrived in the person of Deputy Rodriguez, and he arrived within approximately five minutes of the initial stop.[9]  During this short interval, Deputy Herbert had ascertained that there was an outstanding warrant on Brown's passenger.  Therefore, when Deputy Rodriguez arrived, Deputy Herbert asked for assistance in corroborating his suspicion that he had smelled non-burning marijuana, but first, both deputies removed Brown's passenger from the Buick and placed him the back of a law enforcement vehicle. Deputy Rodriguez then approached the driver's side of the Buick to talk to Brown, who was still in the driver's seat of the Buick.  Deputy Herbert remained a few steps back from the Buick while Deputy Rodriguez spoke to Brown.  When Deputy Rodriguez walked up to the car, he, too, smelled non-burning marijuana.  When he asked Brown if there was marijuana in the car, Brown became nervous - exhibiting rapid breathing, sweating, and shaking hands - and began leaning towards the driver's side door.  Deputy Rodriguez asked Brown to step out of the car, and the deputy then saw in plain view a plastic bag of marijuana, containing just over six grams of the drug divided into several smaller plastic baggies, between the driver's seat and door.

---

[9]Although defense counsel suggested at the hearing that a dispatch log put Deputy Rodriguez's arrival on the scene at 11:07 a.m., there was no evidence admitted to the record to contradict the sworn testimony of the deputies that Deputy Rodriguez arrived within approximately five minutes of the initial stop.  Moreover, as described in Part I above, the sequence of events as described by the two deputies and Brown's father tends to corroborate the conclusion that Deputy Rodriguez arrived at the scene before he apparently "keyed up" on his radio at 11:07 a.m.

The Supreme Court has set forth specific criteria concerning the warrantless seizure of incriminating evidence found in plain view. First, the officer seizing the evidence must not have violated the Fourth Amendment in arriving at the position from which the evidence can be plainly viewed. Horton v. California, 496 U.S. 128, 136 (1990). In addition, the incriminating nature of the item must be "immediately apparent," and the police must have a lawful right of access to the object. Id. at 136-37. Here, as discussed above, the initial stop of the Buick was valid. Deputy Herbert smelled marijuana during his initial encounter with Brown, and he sought to timely clarify the marijuana issue by asking Deputy Rodriguez for corroboration. Upon confirmation of the marijuana odor by Deputy Rodriguez, Brown was asked to exit the car, and the bag of marijuana was then in plain view.

When Brown exited the car, he disclosed the existence of the loaded firearm under the front seat. However, even if Brown had not disclosed the gun, Brown was subject to custodial arrest upon discovery of the marijuana, and the deputies were authorized to search the passenger compartment of the Buick incident to Brown's arrest. Thornton v. United States, 541 U.S. 615, 617, 623 (2004); New York v. Belton, 453 U.S. 454, 460 (1981); Johnson v. Wright, 509 F.2d 828, 830 (5th Cir. 1975).[10] In addition, the discovery of the

---

[10]In Rawlings v. Kentucky, 448 U.S. 98, 111 (1980), the Court had "no difficulty" in upholding a search as incident to the defendant's arrest even though the search preceded the formal arrest. Nor have the lower courts insisted that a defendant be formally arrested before a police officer with probable cause may conduct a search incident to arrest. United States v. Goddard, 312 F.3d 1360, 1364 (11th Cir. 2002) (citing Rawlings); United States v. Armstrong, 16 F.3d 289, 294 (8th Cir. 1994) (having probable cause to arrest prior to conducting the search, the search will be upheld as a valid search incident to arrest); see also United States v. Potter, 895 F.2d 1231, 1234 (9th Cir. 1990) (officer with probable cause to arrest defendant "was entitled to search [the defendant] before formally making the arrest. A search incident to an arrest is valid whether it occurs immediately before or after the arrest."); United States v. Thornton, 733 F.2d 121, 128 n.9 (D.C. Cir. 1984) (having probable

13

marijuana provided probable cause to search the vehicle for additional contraband. United States v. Ross, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." Id.).[11]

In sum, once Deputy Herbert made the initial, valid stop to investigate whether Brown was operating the Buick in compliance with Georgia's vehicle registration laws and to investigate whether the car was stolen, he identified the smell of non-burning marijuana when he first spoke with Brown. For safety reasons, Deputy Herbert set about to resolve the car registration issue but kept his suspicions about the marijuana to himself until Deputy Rodriguez arrived shortly thereafter. Deputy Rodriguez confirmed the smell of marijuana, asked Brown to exit the car, and discovered a bag of marijuana in plain view. Brown then revealed the location of a loaded firearm under the seat. From the time Deputy Herbert initiated the stop until the marijuana and then the loaded firearm were discovered, approximately twenty minutes had elapsed.

The Court is satisfied that articulable suspicion and then probable cause to expand the scope of the initial stop was quickly developed; the deputies worked with little or no delay to investigate the presence of drugs that was suggested by the odor of marijuana. Thus, the Court finds that the scope and duration of the stop pass constitutional muster.

---

cause to arrest, it mattered not that the search preceded the formal arrest or that the officer told defendant that he was not under arrest before conducting the search).

[11]As there were multiple bases for searching the Buick after the initial lawful stop of the vehicle and discovery of the bag of marijuana, Brown's arguments concerning whether he could have provided voluntary consent to search the Buick are moot. (See doc. no. 12, Memo., pp. 11-12).

14

C.     **Allegation of Pretextual Search of Car**

Finally, Brown also argues that Deputy Rodriguez's search of the car was pretextual because "nothing in the record" indicates that any officer involved in the stop smelled marijuana coming from Brown, his passenger, or the Buick. (Doc. no. 12, p. 9). However, as set forth in detail above, the hearing testimony revealed that Deputy Herbert smelled marijuana upon his first approach to the Buick and asked for Deputy Rodriguez's assistance in confirming or dispelling his suspicions. Deputy Rodriguez also testified that he smelled non-burning marijuana when he approached the Buick. Defense counsel tried mightily to challenge the credibility of the deputies at the hearing,[12] but the fact remains that the only evidence of record is the testimony of the two deputies confirming that they smelled non-burning marijuana. Brown did not testify or provide an affidavit disputing that there was an odor of marijuana at the time the Buick was stopped. Brown's father testified that he had not smelled marijuana when riding in the car earlier that morning, but he was not present when Deputy Herbert initiated the traffic stop.

"Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the factfinder). In making its credibility determination, the Court must take into consideration not only the

---

[12]Deputy Herbert admitted under questioning that in 2005 he had been suspended for ten days after giving testimony before a RCSO Disciplinary Review Board that contradicted previous statements he had given on the same issue.

interests of the witness, but also "the internal consistency of the [witness's] testimony, or his

candor or demeanor on the stand." Ramirez-Chilel, 289 F.3d at 749, 750 (citations omitted).

Having reviewed the testimony at the hearing, observed the demeanor of the

witnesses, and considered the interests of the witnesses, the Court credits the deputies'

testimony that they smelled marijuana. Not only is there nothing to contradict the sworn

testimony, the fact remains that marijuana was discovered, and it was discovered directly

below the open window where each deputy had spoken with Brown and smelled marijuana.[13]

Additionally, although Brown relies heavily on the affidavit of his father stating that Deputy

---

[13]At the hearing, defense counsel cited the Court to People v. Argenian, 423 N.E.2d 289, 290 (Ill. App. 1981) for the proposition that the deputies should not be able to rely only on their testimony that they smelled marijuana to justify prolonging the stop and/or searching Brown's vehicle. Aside from the fact that rulings from the state courts in Illinois are not binding on this Court, this proposition from Argenian was subsequently - and explicitly - rejected by the Illinois Supreme Court in People v. Stout, 477 N.E.2d 498 (Ill. 1985). In reversing a lower court's decision to grant a motion to suppress, the Illinois Supreme Court found that the testimony of a trained and experienced police officer that he smelled marijuana need not be corroborated to find that probable cause to search a vehicle existed. Id. at 503. The Stout Court ruled:

> The trial court erroneously relied on People v. Wombacher (1982), 104 Ill. App.3d 812, 60 Ill. Dec. 577, 433 N.E.2d 374, and People v. Argenian (1981), 97 Ill. App.3d 592, 53 Ill. Dec. 97, 423 N.E.2d 289. In both of those cases the appellate court held that an officer's testimony that he smelled the odor of burning cannabis must be corroborated in order to establish probable cause. Such additional corroboration is not required where a trained and experienced police officer detects the odor of cannabis emanating from a defendant's vehicle.
>
> Hence, to the extent that our holding in this case conflicts with the holdings in People v. Wombacher (1982), 104 Ill. App.3d 812, 60 Ill. Dec. 577, 433 N.E.2d 374, People v. Argenian (1981), 97 Ill. App.3d 592, 53 Ill. Dec. 97, 423 N.E.2d 289, and any other case dealing with this issue, they are incorrect and are not to be followed.

Id.

Herbert told Brown's father that Brown would be free to go as soon as officers finished processing the passenger, Deputy Herbert does not recall making such a statement. Deputy Herbert also reasonably explained that he would not have mentioned the marijuana investigation to Brown's father for safety reasons and to maintain order at the scene.

In sum, Brown has not established that the search of the Buick was pretextual. The initial stop of the Buick was valid. Although the deputies eventually dispelled any suspicion about the ownership of the vehicle or the time remaining to validly register the vehicle, articulable suspicion and then probable cause concerning drug contraband was quickly developed; Deputy Herbert smelled non-burning marijuana during his first encounter with Brown and had his suspicions confirmed by Deputy Rodriguez within minutes of the initial stop. The deputies were authorized to search the vehicle pursuant to Brown's arrest and/or in search of further contraband once the bag of marijuana was discovered in plain view. The drugs and loaded firearm were discovered within approximately twenty minutes from when Brown was first stopped. There is no basis for recommending that the motion to suppress be granted.

### III. CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that Brown's motion to suppress be **DENIED**.

SO REPORTED and RECOMMENDED this 23rd day of February, 2006, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

17

# United States District Court
## *Southern District of Georgia*

UNITED STATES OF AMERICA          *

             vs.          *          CASE NO.  CR105-124

CHRISTOPHER JAMES BROWN          *

                                *

                                *

The undersigned, a regularly appointed and qualified deputy in the office of this Clerk of this District, while conducting the business of the Court for said Division does hereby certify the following:

1. Pursuant to instructions from the court, and in the performance of my official duties, I personally placed in the U.S. Mail a sealed envelope bearing the lawful frank of the Court, and properly addressed to each of the persons, parties or attorneys listed below; and

2. That the aforementioned envelope(s) contain a copy of the documents known as Rpt & Recommendation  dated 2/23/06 , which is part of the official records of this case.

Date of Mailing: 2/23/06
Date of Certificate: 2/23/06

SCOTT L. POFF, CLERK

By : _L. Flanders_

NAME:

1. Christopher James Brown
2. James S. V. Weston
3.
4.
5.
6.
7.

| Cert/Copy | | | Cert/Copy | | |
|---|---|---|---|---|---|
| ☐ | ☐ | District Judge | ☐ | ☐ | Dept. of Justice |
| ☐ | ☒ | Magistrate Judge | ☐ | ☐ | Dept. of Public Safety |
| ☐ | ☐ | Minutes | ☐ | ☐ | Voter Registrar |
| ☐ | ☐ | U.S. Probation | ☐ | ☐ | U.S. Court of Appeals |
| ☐ | ☐ | U.S. Marshal | ☐ | ☐ | Nicole/Debbie |
| ☐ | ☒ | U.S. Attorney | ☐ | ☐ | Ray Stalvey |
| ☐ | ☐ | JAG Office | ☐ | ☐ | Cindy Reynolds |